NOTICE

*Memorandum decisions of this court do not create legal precedent. A party wishing to cite such a decision in a brief or at oral argument should review Alaska Appellate Rule 214(d).*

THE SUPREME COURT OF THE STATE OF ALASKA

| | |
|---|---|
| ESTATE OF MOLLY PARKS, ) | |
| ) | Supreme Court No. S-17757 |
| Appellant, ) | |
| ) | Superior Court No. 1PE-18-00029 CI |
| v. ) | |
| ) | MEMORANDUM OPINION |
| PETERSBURG BOROUGH, ) | AND JUDGMENT* |
| WILLIAM "CHRIS" ALLEN, and ) | |
| STATE OF ALASKA, ) | No. 1950 – February 22, 2023 |
| ) | |
| Appellees. ) | |
| ) | |

Appeal from the Superior Court of the State of Alaska, First Judicial District, Petersburg, William B. Carey, Judge.

Appearances: Mark Choate, Choate Law Firm LLC, Juneau, for Appellant. Alfred Clayton, Jr., Clayton & Diemer, LLC, Anchorage, for Appellee Petersburg Borough. Kevin T. Fitzgerald, Ingaldson Fitzgerald, P.C., Anchorage, for Appellee William "Chris" Allen. Susan Orlansky, Reeves Amodio LLC, Anchorage, for Amici Curiae Alaska National Insurance Co. and Umialik Insurance Co. No appearance by State of Alaska.

Before: Winfree, Chief Justice, Carney and Henderson, Justices. Carney, Justice, dissenting. [Maassen and Borghesan, Justices, not participating.]

---

\*       Entered under Alaska Appellate Rule 214.

# I.    INTRODUCTION

This appeal focuses on what constitutes an intentional tort to avoid the Alaska Workers' Compensation Act's exclusive liability provision.  After an employee died in a vehicle crash, her estate brought a wrongful death action against a co-employee and the employer; both sought dismissal on the basis that the Act's exclusive liability provision shielded them from tort liability.  The superior court dismissed the suit, concluding that the Estate had not alleged sufficient facts to show an intentional tort that would evade the Act's exclusive liability provision.  The Estate appeals, raising the narrow legal question whether asserting extreme indifference to the value of human life is equivalent to asserting intent to harm and thus an intentional tort.  Based on our precedent, we answer "no" and affirm the superior court's dismissal of the Estate's wrongful death claim.

# II.    FACTS AND PROCEEDINGS

## A.    Facts[1]

William "Chris" Allen has a seizure disorder.  In 2011 he experienced a seizure while training to become an electrical lineman; he experienced another seizure a few days later while driving under the influence of alcohol.  Allen knows that alcohol triggers his seizures.  Twice in 2012 and again in 2014 Allen failed to disclose his seizures and falsely certified on driver's license applications "that he had not suffered

---

[1]    Because the superior court dismissed the case under Alaska Civil Rule 12(b), we review as though the complaint's factual allegations are true, with reasonable inferences drawn in the Estate's favor. *See Belluomini v. Fred Meyer of Alaska, Inc.*, 993 P.2d 1009, 1014 (Alaska 1999) (reviewing motion to dismiss requires that we "presume all factual allegations of the complaint to be true and [make] all reasonable inferences . . . in favor of the non-moving party" (alterations in original) (quoting *Kollodge v. State*, 757 P.2d 1024, 1026 (Alaska 1988))).

from a seizure disorder in the last five years." Allen had another seizure while working in January 2015, and his doctor instructed him to not operate a vehicle.

Allen began working full time for the Petersburg Borough in its Parks and Recreation Department in December 2015. The head of another Borough department inquired about the hiring because his department earlier had not hired Allen due to his inability to operate a vehicle. Allen had two seizures in early 2016 while working for the Borough; he was taken to the hospital following one of them, but he refused treatment. A staff doctor told Allen not to drive; the doctor also contacted the Borough and specifically instructed that it should not allow Allen to drive. The Borough later created a safety plan requiring that when Allen was working he would: have another employee present at all times; report to his supervisor every 20 minutes, verifying he had not had a seizure; and not open the Parks and Recreation facility alone. The Borough nonetheless continued scheduling Allen for lifeguard duties and frequently allowed him to drive a Borough van.

Molly Parks was 18 years old in July 2016 and had a Parks and Recreation Department summer job as a lifeguard and camp counselor. The Borough was preparing for a July 4 recreational run, and Parks was one of the employees assigned to stage rest stations along the route. A week before the event, the Borough scheduled Allen to drive a van transporting employees on the day of the run. Allen and his supervisor met at a Borough facility and drove in separate cars to a park where they met three other employees, including Parks. At the Borough's direction the three employees got in the van, and Allen drove away. Allen had a seizure while driving; he lost control of the van, and it careened over a guardrail, killing Parks and another worker. Allen was injured, and a hospital blood test detected an alcohol level below the legal limit but demonstrating significant alcohol consumption the previous night. Allen later was charged with two

counts of second-degree murder,[2] two counts of manslaughter,[3] and one count of first-degree assault.[4]

## B. Proceedings

In June 2018 Parks's Estate brought a wrongful death suit against the Borough and Allen, later adding a separate cause of action against the State not relevant to this appeal. The Estate contended that the Borough's and Allen's actions constituted intentional torts. The Borough and Allen both raised as a defense that the Alaska Workers' Compensation Act's exclusive liability provision barred the claims.[5]

The Borough moved to dismiss the Estate's claims against it on the basis that the Estate had not alleged the Borough "acted with a specific intent to cause injury"

---

[2] AS 11.41.110(a)(2) (defining murder in the second degree as "knowingly engag[ing] in conduct that results in the death of another person under circumstances manifesting an extreme indifference to the value of human life").

[3] AS 11.41.120(a)(1) (defining manslaughter as "intentionally, knowingly, or recklessly caus[ing] the death of another person under circumstances not amounting to murder in the first or second degree").

[4] AS 11.41.200(a)(3) (defining assault in the first degree as "knowingly engag[ing] in conduct that results in serious physical injury to another under circumstances manifesting extreme indifference to the value of human life").

[5] AS 23.30.055 ("The liability of an employer prescribed in AS 23.30.045 is exclusive and in place of all other liability of the employer and any fellow employee to the employee, the employee's legal representative, . . . and anyone otherwise entitled to recover damages from the employer or fellow employee at law . . . on account of the injury or death."). Under AS 23.30.045(a)-(b) an employer is required to "secure the payment to employees" of workers' compensation and "[c]ompensation is payable irrespective of fault as a cause for the injury." The Estate did not contend that the Borough failed to secure payment of allowable workers' compensation benefits.

and thus had not overcome the Act's exclusive remedy provision.[6] Allen joined the Borough's motion as to the Estate's claims against him. The Borough relied on our exclusive remedy precedents; we have held that under the Act even gross negligence and willful failure to comply with safety standards are not sufficient to overcome the exclusive liability bar.[7] Quoting *Fenner v. Municipality of Anchorage*, the Borough implied that at most its actions constituted "aggravated negligence" or "knowingly permitting a hazardous work condition to exist" but were not "the kind of actual intention to injure that robs the injury of [its] accidental character."[8]

Denying that the Estate was seeking "to create a new exception to workers' compensation exclusivity," the Estate argued that it instead sought "consistency in Alaska's definition of 'intentional tort.' " It asked the superior court to "find in the civil context what the Alaska legislature has already determined in the criminal: that extreme indifference to the value of human life is the equivalent of intent to harm." The crux of the Estate's theory was that Allen's and the Borough's actions fell within the common law's "constructive malice" state of mind,[9] now part of the second-degree murder

---

[6] *See* Alaska R. Civ. P. 12(b)(6) (allowing motion to dismiss based on "failure to state a claim upon which relief can be granted").

[7] *See, e.g.*, *Fenner v. Municipality of Anchorage*, 53 P.3d 573, 577 (Alaska 2002) (limiting exclusive remedy provision's intentional tort exception to injury caused by employer having specific intent to injure employee); *Williams v. Mammoth of Alaska, Inc.*, 890 P.2d 581, 585-86 (Alaska 1995) (holding employer's intentional safety regulation violation did not constitute intentional tort); *Van Biene v. ERA Helicopters, Inc.*, 779 P.2d 315, 318-19 (Alaska 1989) (holding employer ordering pilots to fly in violation of FAA flight time and duty regulations did not constitute intentional tort).

[8] 53 P.3d at 577 (quoting *Van Biene*, 779 P.2d at 319).

[9] *See Neitzel v. State*, 655 P.2d 325, 327 (Alaska App. 1982) ("Common law courts permitted a jury to find malice in the absence of a specific intent to kill where 'in
(continued...)

statute.[10]  The Estate argued that "the purpose of workers' compensation law is not furtheredby allowing an employer or employee who exhibits extreme indifference to the value of human life . . . to use the compensation law as a shield against liability."  The Estate maintained:  "Alaska law recognizes that acts exhibiting extreme indifference to the value of human life are on par with intentional acts in terms of blameworthiness."[11]

The superior court granted the dismissal motion.  The court noted that the Act defines a compensable "death" as "only death resulting from an injury"[12] and defines "injury" as "accidental injury or death arising out of and in the course of employment."[13] Although recognizing that we have excepted intentional torts from the exclusivity provision, the court characterized the necessary intent as "actual and specific" and quoted *Fenner*:  "[A]n intentional harm is a harm committed by a person who acts with a specific intent to cause an injury."[14]

---

[9]     (...continued)
the absence of any circumstance of exculpation or mitigation an act [was] done with such heedless disregard of a harmful result, foreseen as a likely possibility, that it differs little in the scale of moral blameworthiness from an actual intent to cause such harm.' " (alteration in original) (quoting ROLLIN M. PERKINS, CRIMINAL LAW § 4 at 768 (2d ed. 1969))).

[10]     *See* AS 11.41.110(a)(2) (defining murder in the second degree as "knowingly engag[ing] in conduct that results in the death of another person under circumstances manifesting an extreme indifference to the value of human life").

[11]     *See* AS 11.41.110(a)(1) (defining murder in the second degree alternatively as causing another's death "with intent to cause serious physical injury . . . or knowing that the conduct is substantially certain to cause death or serious physical injury").

[12]     AS 23.30.395(13).

[13]     AS 23.30.395(24).

[14]     53 P.3d 573, 577 (Alaska 2002) (quoting *Christensen v. NCH Corp.*, 956 (continued...)

The superior court summarized the Estate's argument as "extreme indifference to human life stands on an even footing with actual intent," meaning the "court should adopt the reasoning of the criminal statutes and apply it" in workers' compensation cases. The court refused, pointing out that the Estate had not identified any jurisdiction that had adopted this standard. The court said that second-degree murder requires "an intent to do the *act*, but without the specific intent to cause the harm." (Emphasis in original.) The court differentiated this "from an actual intent to both do the act, *and to do the harm*," (emphasis in original) which it saw as "the required state of mind for avoiding the exclusive remedy provision." The court concluded that the alleged actions did not meet that level of intent. The court also revealed in a footnote to its written decision that Allen had pleaded guilty to manslaughter and was awaiting sentencing in his criminal case.[15]

The superior court dismissed the Estate's claims against the Borough, later clarifying that the dismissal included the claims against Allen as well. The court entered partial final judgment in favor of the Borough and Allen. The Estate appeals.

## III. STANDARD OF REVIEW

"A grant of a motion to dismiss a complaint for failure to state a claim under Alaska Civil Rule 12(b)(6) is reviewed de novo."[16]

---

[14]    (...continued)
P.2d 468, 475 (Alaska 1998)).

[15]    *See* AS 11.41.120(a)(1) (defining manslaughter as "intentionally, knowingly, or recklessly caus[ing] the death of another person under circumstances not amounting to murder in the first or second degree").

[16]    *Patterson v. Walker*, 429 P.3d 829, 831 (Alaska 2018) (quoting *Bachner Co. v. State*, 387 P.3d 16, 20 (Alaska 2016)).

## IV.  DISCUSSION

### A.  The Estate's Appeal Is Narrowly Focused.

The Estate concedes in its opening brief that its allegations against the Borough and Allen do not rise to the level necessary to assert an intentional harm claim under our precedents.  Asserting that this case rests in a "gray area" of the law and that we should delineate some new boundaries, the Estate contends the alleged "facts present[] a tort so outrageous and extreme — with consequences so serious — that, *despite its existence outside of strict intentional torts*, the character of the actions at issue exceed the limits of 'accidental.' " (Emphasis added.)  We thus focus solely on the legal question presented without needing to further parse the factual allegations of the claims against the Borough and Allen.[17]

### B.  The Superior Court Did Not Err By Dismissing The Estate's Claims.

The Act requires an employer to provide workers' compensation for work-related injuries and deaths.[18]  When an employee suffers a work-related injury or death, this compensation is the employer's (and any co-employees') exclusive liability for a

---

[17]     The dissent takes an entirely different approach to the issue before us and ventures into legal analyses not raised or briefed by the parties to this appeal.  Specifically, the dissent posits that any action by an employer or co-employee that constitutes a crime somehow related to the injury-causing incident, regardless of the elements of the crime, should be sufficiently egregious to overcome the exclusive liability protection under the Act.  The dissent presumably also posits that an injured employee would be required to show the commission of a crime only by the preponderance of the evidence standard of proof for a tort action rather than the beyond a reasonable doubt standard the State would have to meet to actually convict someone of a crime.  Finally, the dissent raises its own doubts about the validity of applicable precedent even though the Estate does not do so.  We decline to follow the dissent into these uncharted waters; we resolve only the legal issue the Estate raised.

[18]     AS 23.30.045.

resulting claim.[19] But we recognized in *Elliott v. Brown* that an intentional tort is outside the exclusivity provision's scope.[20] We agreed with other courts that the purposes of the Act "would not be furthered by allowing a person who commits an intentional tort to use the compensation law as a shield against liability."[21] But we thereafter have rejected attempts to expand the exclusive liability exception to include, for example, intentional violations of safety regulations and intentionally ordered violations of pilot flight time regulations absent a specific intent to harm.[22] In *Fenner* we required a "specific intent to cause an injury" to avoid the exclusive liability bar, and we held that it was insufficient to assert an intentional act having a substantial certainty of harm absent a specific intent to harm.[23]

---

[19] AS 23.30.055 ("The liability of an employer prescribed in AS 23.30.045 is exclusive and in place of all other liability of the employer and any fellow employee to the employee, the employee's legal representative, . . . and anyone otherwise entitled to recover damages from the employer or fellow employee at law . . . on account of the injury or death."); *see Burke v. Raven Elec., Inc.*, 420 P.3d 1196, 1202-03 (Alaska 2018) (describing "grand bargain" underlying workers' compensation system as employees having no right to sue in tort for workplace injuries or deaths but having access to workers' compensation benefits without regard to fault or other defenses employers would have in tort context).

[20] 569 P.2d 1323, 1327 (Alaska 1977).

[21] *Id.*

[22] *Williams v. Mammoth of Alaska, Inc.*, 890 P.2d 581, 585-86 (Alaska 1995) (holding employer's intentional safety regulation violation did not constitute intentional tort); *Van Biene v. ERA Helicopters, Inc.*, 779 P.2d 315, 318-19 (Alaska 1989) (holding employer ordering pilots to fly in violation of FAA flight time and duty regulations did not constitute intentional tort).

[23] 53 P.3d 573, 577 (Alaska 2002) (quoting *Christensen v. NCH Corp.*, 956 P.2d 468, 475 (Alaska 1998)). We note that in *Fenner* we used the terms "injury" and

(continued...)

Even if, from the Borough's and Allen's perspectives, there were substantial certainties that some injury or death would result from Allen's driving, we rejected the "substantial certainty" standard in *Fenner*. We see little difference between the "substantial certainty" standard rejected in *Fenner* and the Estate's "extreme indifference to the value of life" standard. The Estate asserts that "[t]he distinction between recklessness and extreme recklessness is at the heart of this matter." But this is a distinction without a difference when contrasting any form of recklessness with a specific intent to harm.

*Fenner* is controlling law, but the Estate did not even discuss *Fenner* in its opening brief, let alone ask us to reconsider *Fenner*'s holding and explain why *Fenner* might have been wrongly decided. We reject the Estate's argument that, because the legislature based some crimes on extreme recklessness or indifference to the value of life, we should incorporate that standard as an exception to the Act's exclusive liability provision.[24] The legislature is, of course, empowered to change the Act as the Estate

---

[23]    (...continued)
"harm" interchangeably. *Id.* at 576-77.

[24]    We note that the Estate has throughout the litigation focused its attention on the "extreme indifference to the value of life" statutory element of second-degree murder, likely because Allen was criminally charged under the second-degree murder statute (as well as under lesser statutory crimes, including manslaughter). And although the superior court noted in its decision that Allen had pleaded guilty only to manslaughter, at oral argument before us the Estate contended Allen had pleaded guilty to second-degree murder.

Despite the general rule that when deciding a motion to dismiss only allegations in the pleadings may be considered, a court also may "consider matters of public record," including court files. *Nizinski v. Currington*, 517 P.2d 754, 756 (Alaska 1974). We take judicial notice of the *State v. Allen* judgment. No. 1PE-17-00046 CR (Alaska Super., Jan. 15, 2019); *see* Alaska R. Evid. 201. It shows Allen pleaded guilty
(continued...)

proposes, but absent explanation why *Fenner* should be overruled, we will not depart from our precedent.

We acknowledge that Parks's death likely was entirely preventable, making it all the more tragic. And we again recognize the harshness of the resulting low compensation available for the workplace death of an employee without dependents.[25] We nonetheless affirm the dismissal of the Estate's wrongful death lawsuit.

## V.    CONCLUSION

We AFFIRM the superior court's judgment.

---

[24]    (...continued)
to one count of manslaughter in exchange for the State dismissing all other charges, including the second-degree murder charge; his sentence included a permanent driver's license revocation and imposed multiple conditions related to his seizure disorder and alcohol use.

A criminal conviction may estop civil relitigation of the elements of the charge for which there was a conviction. *See Bearden v. State Farm Fire & Cas. Co.*, 299 P.3d 705, 712-13 (Alaska 2013) (concluding that plea in criminal case precluded relitigation of essential elements of charge). A criminal conviction thus may establish tort liability as a matter of law if the criminal conduct contains all elements of the tort. *See Lane v. Ballot*, 330 P.3d 338, 344 (Alaska 2014) (deciding that criminal conviction was sufficient to establish liability for intentional torts).

In the superior court the Estate did not attempt to use collateral estoppel to establish Allen's intentional tort liability based on Allen's guilty plea to manslaughter. Nor has the Estate suggested during this appeal that Allen's guilty plea to manslaughter impacted the superior court's decision. Beyond noting that the manslaughter conviction judgment does not express whether it was based on an intentional, knowing, or reckless cause of death, *see* AS 11.41.120(a)(1), we do not address this issue.

[25]    *See Burke v. Criterion Gen., Inc.*, 499 P.3d 319, 328 (Alaska 2021) (noting harshness of low workers' compensation benefits for estate of employee who dies without dependents and that remedy is left to legislature).

CARNEY, Justice, dissenting.

The court today holds that even criminal conduct by an employer and by a fellow employee falls within the exclusive remedy of the Workers' Compensation Act. It then holds that the estate of the employee who was killed as a direct result of these criminal acts is not entitled to any recovery except the death benefit of $10,000 in funeral expenses allowed by workers' compensation.[1] I cannot join in such a clear miscarriage of justice; I therefore dissent.

As the court relates, Allen had a longstanding history of seizures before he applied for work at the Borough,[2] including a seizure while employed elsewhere in Petersburg earlier in the same year he started working for the Borough.[3] The court summarizes the seizures Allen suffered at work for the Borough in early 2016, but some important details are omitted. As the superior court observed, Allen began working for the Borough in December. Only months later, in February or March, Allen "had a seizure while working at the Petersburg Parks and Recreation pool front desk. Allen was found collapsed on the floor and complaining of a headache, and Allen's supervisors saw on surveillance video that he had suffered a seizure. Following this incident, Petersburg developed and adopted a plan to have a second employee always present with Allen so that he would not be alone during a seizure."

The Borough's safety plan for Allen's protection served its purpose not long after it was instituted. "On April 1 . . . Allen had a seizure in the Petersburg Parks and Recreation building and a co-worker caught him as he collapsed." Allen was taken to the hospital.

---

[1] AS 23.30.215(a)(1).

[2] Opinion at 2-3.

[3] *Id.* at 3.

But Allen refused treatment and was specifically instructed not to drive, "and [the doctor] contacted Petersburg Parks and Recreation to specifically tell them to not let Allen drive. Following this incident, the heads of Petersburg Parks and Recreation met with Allen, and it was decided that Allen must check-in every 20 minutes with a supervisor to make sure he had not had a seizure, and that Allen was precluded from opening the Petersburg Parks and Recreation facility by himself. *However, Petersburg continued to permit Allen to work as a lifeguard and drive the Borough van.*"[4]

As the superior court observed in its order dismissing the case, "[t]he tragic incident involved in this action took place less than 3 months later, on July 4, 2016." About a year later, Allen was charged with two counts of second-degree murder and two counts of manslaughter, one for each of the summer employees that he killed, as well as one count of first-degree assault against the employee who survived; he was also charged with one count of second-degree unsworn falsification for lying on his driver's license application in 2014.[5]

Despite the Borough's decision to repeatedly endanger Allen and any employees unfortunate enough to be required to ride in a vehicle driven by Allen, the court concludes that neither the Borough's nor Allen's callous and criminal conduct is sufficient to take Parks's death outside the exclusivity provision of the Workers'

---

[4]     Emphasis added.

[5]     Although Allen certified the information on the driver's license application under penalty of perjury, the State charged him with unsworn falsification under AS 11.56.210 rather than with perjury. Perjury is a class B felony; Allen was charged with a class A misdemeanor. *Compare* AS 11.56.200 (Perjury), *with* AS 11.56.210 (Unsworn Falsification in the Second Degree).

Compensation Act.[6]  The court acknowledges that in our only previous workers' compensation case involving criminal conduct, *Elliott v. Brown*,[7] we recognized that a conviction for assault and battery *was* sufficient to remove the Act's exclusive liability shield with respect to a claim against a co-employee, but it nevertheless declines to reverse the dismissal of the Estate's claim against Allen.  I believe that in doing so the court has misinterpreted *Elliott* as well as the cases on which it relied and those that followed it.  I also believe that *Elliott* allows us to recognize that the *employer's* related criminal conduct takes its actions "outside the exclusivity provision's scope."[8]

**DISCUSSION**

*Elliott* presented us with an assault by one worker on two coworkers:  he shoved one and punched the other and, like Allen, reached a plea agreement for a crime that did not require a specific intent to cause injury.[9]  We held that such assaults were intentional torts that removed the case from the employer's exclusive liability of workers' compensation because "[t]he socially beneficial purpose of the work[ers'] compensation law would not be furthered by allowing a person who commits an intentional tort to use the compensation law as a shield against liability."[10]  We therefore held that Elliott and his coworker were "entitled to maintain [their] common-law tort action against Brown," the coworker who assaulted them.[11]

---

[6]  Opinion at 9-10.

[7]  569 P.2d 1323 (Alaska 1977).

[8]  Opinion at 9.

[9]  569 P.2d at 1325; former AS 11.15.230 (1970).

[10]  *Elliott*, 569 P.2d at 1327.

[11]  *Id.*

In *Elliott* we did not require "a specific intent to cause an injury," let alone a specific intent to cause a particular injury to a particular person,[12] in order to plead an intentional tort for a work-related battery. Alaska law was already clear that such a common law action for battery did not require "malicious motives."[13] And we have more recently stated that to prove the intentional tort of battery "one need not intend injury but must intend to cause contact."[14]

Our decision that intentional torts are exempt from the exclusivity provision appears to rest on both the policy behind workers' compensation — "a means of spreading the cost of hazards of the workplace" in the face of increasing industrialization[15] — and the conclusion that some acts, at least criminal acts by coworkers, "are not accidental from the standpoint of the tortfeasor"[16] and are so egregious as to deny the actor protection behind the exclusivity provision's shield.

Both Allen's and the Borough's acts were criminal; each of them behaved in a way that should prevent them from evading responsibility for their conduct by hiding behind the shield of workers' compensation. Allen was charged with a variety of felonies and ultimately pled guilty only to manslaughter. But he committed other crimes that were not charged. Each time he falsely certified that he had not suffered a seizure for five years, he committed a crime, even if he was only charged with his most recent

---

[12]    *See* Opinion at 7.

[13]    *Merrill v. Faltin*, 430 P.2d 913, 917 (Alaska 1967).

[14]    *DeNardo v. Corneloup*, 163 P.3d 956, 960 (Alaska 2007).

[15]    *Elliott*, 569 P.2d at 1327.

[16]    *Id.*

false statement.[17] Because he lied on his license application and because he had a disqualifying medical condition, his license was not valid for two distinct reasons.[18] Thus, each time Allen drove a motor vehicle from 2012 to 2016, he committed a crime — driving without a valid license.[19]

The Borough knew that Allen could not legally or safely drive: it had been expressly told so and had implemented a safety plan because of Allen's on-the-job seizures. Yet it required him to drive the Borough's van. Each time the Borough did so, it was an accomplice in his crimes.[20] And on the day Parks was killed, the Borough ordered Allen's coworkers to ride in the van that he was driving. Unlike *Elliott* then, the

---

[17]     AS 11.56.200.

[18]     *See* AS 28.15.011 (requiring all drivers to be validly licensed); AS 28.15.031(b)(4) and (6) (denying license to those whose "physical or mental disability [means] the person is not able to drive safely" or who "knowingly made a false statement in [their] application for a license or . . . committed fraud in connection with the . . . application for, or in obtaining or attempting to obtain, a license."); 2 Alaska Administrative Code (AAC) 90.440(a) (2021) ("The department will not issue a driver's license to a person who has had an uncontrolled seizure . . . . A person who has a driver's license and who has had an uncontrolled seizure . . . must surrender that person's driver's license to the department.").

[19]     Former AS 28.15.011(b) (2016) (requiring valid license to drive motor vehicle), *amended by* ch. 1, § 42, 4SSLA 2017; AS 28.90.010(a) (classifying violations of driving statutes as misdemeanors unless otherwise categorized). The 2017 amendment to AS 28.15.011 reclassified violations of AS 28.15.011(b) as infractions.

[20]     *See* AS 11.16.100 (Legal accountability based upon conduct); AS 11.16.110 (Legal accountability based upon the conduct of another); *see also* AS 11.41.110(a)(2) (defining second-degree murder to include circumstances in which person "knowingly engages in conduct that results in death of another under circumstances manifesting extreme indifference to value of human life").

Estate's cause of action against the Borough is not based on vicarious liability,[21] but on the Borough's own affirmative actions that led to Parks's death.

Both Allen and the Borough committed crimes that led to far more serious consequences than the "shoving" and "punching" that we decided were sufficient to overcome exclusive liability in *Elliott.* Yet the court declines to hold that their crimes are sufficiently intentional to remove this case from the exclusivity provision of the Workers' Compensation Act. The court relies upon *Fenner v. Municipality of Anchorage*[22] to do so. But *Fenner*, in my opinion, does not mandate this result.

In *Fenner* we discussed an earlier case,[23] *Van Biene v. ERA Helicopters, Inc.*, where we concluded that violation of safety regulations was not sufficient to exempt a case from the workers' compensation exclusivity provision.[24] Van Biene's widow sued his employer after he died in a crash, alleging that the employer had committed "negligence and gross negligence" when it required Van Biene to work longer hours than permitted by regulation.[25] After reiterating that even gross negligence was not enough to exempt a workplace injury or death from the exclusivity provision, we noted in dicta that Van Biene had failed to satisfy the "stiff burden . . . to demonstrate intent to harm

---

[21]     *Elliott*, 569 P.2d at 1326 (observing that because corporate employer's liability in that case was vicarious, "we are not insulating [the corporation] against common-law liability for its own wilful acts").

[22]     53 P.3d 573 (Alaska 2002).

[23]     *Id.* at 576.

[24]     779 P.2d 315 (Alaska 1989).

[25]     *Id.* at 317.

by the employer."[26]  We reiterated *Van Biene*'s holding in *Williams v. Mammoth of Alaska, Inc.*, saying that we had in *Van Biene* "adopted the majority rule that an employer's violation of government safety regulations, even if willful and knowing, does not rise to the level of an intentional tort."[27]  And *Williams* concluded that no evidence supported finding that the employer in that case "violated safety standards with knowledge that harm to an employee would be a substantial certainty."[28]

We reaffirmed in *Fenner* that a violation of safety regulations was insufficient to take a case out of the exclusivity provision,[29] but *Fenner* seemingly added a requirement to show "a specific intent to cause an injury"[30] to be exempt from the exclusive liability provision.  After considering *Williams* and *Van Biene*, the *Fenner* court turned to *Christensen v. NCH Corp.*,[31] which addressed an alleged claims-processing conspiracy to interfere with an employee's medical treatment.  Citing cases interpreting "wilful misconduct" in the context of insurance law, *Christensen* said, "In this context, an intentional harm is a harm committed by a person who acts with a specific intent to cause an injury."[32]  The *Fenner* court then stated, without acknowledging any ambiguity in *Christensen*:  "*In the context of the exclusive remedy*

---

[26]  *Id.* at 319 (quoting *Stafford v. Westchester Fire Ins. Co. of N.Y.*, 526 P.2d 37, 43 n.29 (Alaska 1974), *overruled on other grounds by Cooper v. Argonaut Ins. Cos.*, 556 P.2d 525 (Alaska 1976)).

[27]  890 P.2d 581, 585 (Alaska 1995) (citing *Van Biene*, 779 P.2d at 318-19).

[28]  *Id.* at 586.

[29]  53 P.3d 573 (Alaska 2002).

[30]  *Id.* at 577.

[31]  951 P.2d 468 (Alaska 1998).

[32]  *Id.* at 475.

*provision of the Act*, 'an intentional harm is a harm committed by a person who acts with specific intent to cause an injury.' "[33]

But *Fenner* used three cases — *Williams*, *Van Biene*, and *Elliott* — to evaluate whether the evidence on summary judgment "amount[ed] to a specific intent to harm."[34]   In my view, the Estate's case, and the rule it asks us to acknowledge, are directly controlled by *Elliott*.  *Williams* and *Van Biene* involved violations of workplace safety rules and do not apply to the facts of this case.  The Estate's case is not based on violations of workplace safety regulations enforced by administrative action, but on conduct that violated generally applicable criminal statutes.  Allen was imprisoned for his conduct and his driver's license was "permanently" revoked.  The Borough has thus far escaped any responsibility for its actions even though the Borough scheduled Allen to drive and required Parks to ride in the van Allen drove.  If *Fenner* correctly identified the sources of our "specific intent to harm" rule, then our holding in *Elliott* requires reversal of the superior court's dismissal order and reinstatement of the Estate's suit against both the Borough and Allen because *Elliott* did not narrow the class of intentional torts that can remove the exclusivity bar.

The common law tort definition of "intent" does not also require intent to inflict a specific harm on a specific person.[35]  A decade before we decided *Elliott*, we held in *Merrill v. Faltin*:

---

[33]     *Fenner,* 53 P.3d at 577 (emphasis added) (quoting *Christensen*, 951 P.2d at 475).

[34]     *Id.*

[35]     RESTATEMENT (SECOND) OF TORTS § 8 A (AM. L. INST. 1965) ("The word 'intent' is used throughout the Restatement of this Subject to denote that the actor desires to cause consequences of his act, or that he believes that the consequences are substantially certain to result from it.").

To make one liable for an assault and battery it is not necessary that he be inspired by malicious motives. If one acts intending to cause a harmful or offensive contact with the person of another, and if the latter is put in imminent apprehension of such a contact, and an offensive contact results, one is liable for an assault and battery even though he acted with no feeling of hostility or ill will or enmity toward the other.[36]

We held that Elliott could pursue his lawsuit against a coworker "for an assault and battery inflicted upon" him by a coworker.[37] Nowhere in the opinion did we require additional proof beyond that specified in *Merrill*; nowhere did we require a specific intent to cause injury, let alone to cause a specific injury to a particular individual. *Fenner*'s statement that the "exception to the exclusive [liability] provision . . . is . . . limited to intentional torts where an employer has a specific intent to injure an employee"[38] is either dicta (if it adds a new requirement), or it restates the rule in *Elliott*.

I fail to see how *Fenner*'s heightened requirement, to the extent it is not dicta, is supported by our prior case law. And I continue to believe that criminal conduct by an employer or an employee falls far outside the fundamental purpose of workers' compensation law. Where, as here, the employer and the fellow employee both committed crimes, particularly crimes that caused the deaths of other employees, I would hold that the workers' compensation exclusivity provision does not bar a civil suit by the estate of the deceased employees.

---

[36]     430 P.2d 913, 917 (Alaska 1967).

[37]     *Elliott*, 569 P.2d at 1325.

[38]     *Fenner*, 53 P.3d at 577.